# EXHIBIT #2

## PLEDGE AND SECURITY AGREEMENT

    **THIS PLEDGE AND SECURITY AGREEMENT** (this "Agreement") is entered into as of the 27th day of December, 2007, by and between **Ravi Roopnarine as Trustee of the RAVI WORLD LAND TRUST dated December 20, 2007**, a Florida land trust (the "Pledgor"), having an address of 11450 Nellie Oaks Bend, Clermont, FL 34711, and **MIRABILIS VENTURES, INC.**, a Nevada corporation (the "Pledgee"), at 2875 South Orange Avenue, Suite 500, PMB 2325, Orlando, Florida 32806. Pledgor and Pledgee are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

### RECITALS:

    **WHEREAS,** the Parties have entered into a Membership Interest Purchase Agreement dated of even date herewith (the "Purchase Agreement"), for the purchase of certain membership interest of **FLHP-MS, LLC**, a Florida limited liability company (the "Company"), whereby Pledgor purchased Seventy Percent (70%) of the total issued and outstanding membership interests of the Company ("Membership Interest") from Pledgee in exchange for the payment of certain consideration and the execution and delivery of this Agreement by Pledgor in favor of Pledgee;

    **WHEREAS,** in accordance with the terms and conditions of the Purchase Agreement, Pledgee has agreed to pay the Purchase Price (as defined in the Purchase Agreement) with the remaining balance of the Purchase Price to be paid pursuant to the terms and conditions of that certain Promissory Note, dated of even date herewith, in the original principal amount of **Five Hundred Eighty-Five Thousand and 00/100 Dollars ($585,000.00)** executed and delivered by the Pledgor in favor of the Pledgee (the "Note") which is collateralized by a first priority security interest in all of Pledgor's interest, right and entitlement in and to the Membership Interest including any and all results and proceeds derived from the sale of the Trust or Property (as these terms are defined in the Purchase Agreement), pursuant to the terms and conditions of this Agreement, and shall be personally guaranteed by **RAVI ROOPNARINE** pursuant to that certain Guaranty Agreement dated of even date herewith (the "Guaranty");

    **WHEREAS,** in consideration of and as a condition of the Purchase Agreement and as further security to secure the prompt and complete payment of the Purchase Price, and the observance and performance of all the Pledgor's obligations and liabilities under the Purchase Agreement and Note (collectively, the "Obligations"), Pledgor agrees to execute and deliver this Agreement pursuant to the terms of which the Obligations shall be collateralized by a first priority security interest in Pledgor's One Hundred Percent (100%) ownership and entitlement in and to the Membership Interest including any and all results and proceeds derived from the sale of the Trust or Property, pursuant to the terms and conditions hereof (the Purchase Agreement, the Note, the Guaranty and this Agreement and any and all agreements and documents executed ancillary thereto shall be collectively referred to herein as the "Transaction Documents," the terms and conditions of which are incorporated herein and are made a apart hereof); and,

    **NOW, THEREFORE,** in consideration of Ten and 00/100 Dollars ($10.00) and the premises, which shall be deemed a material, integral part of this Agreement, incorporated herein by this reference, and not mere recitals thereto, and in further consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.    **Grant of Security Interest.**  Pledgor hereby grants to Pledgee, as security for the payment of the Obligations, a first priority security interest in:  (a) Pledgor's One Hundred Percent (100%) of the Membership Interest, and (b) any and all results and proceeds thereof, including, without limitation, the results and proceeds derived from the sale of the Trust or Property, all dividends and other distributions to which Pledgor may become entitled due to Pledgor's ownership of the Membership Interest, (Sections 1(a) and 1(b) together with the "Assignment" (as defined below), and any property described in Sections 8 and 9 hereto, and all proceeds of any of the foregoing, may be hereinafter, collectively, referred to as the "Pledged Collateral). Pledgor agrees to execute and deliver to Pledgee: (i) an Assignment in substantially the form of **Exhibit A** attached hereto and made a part hereof, appropriately endorsed in blank with respect to the Membership Interest, and (ii) such other documents of transfer as Pledgee may from time to time request to enable Pledgee to transfer the Membership Interest into its name or the name of its nominee in the Event of Default (as defined below) (all of the foregoing, hereinafter, referred to as the "Powers").

2.    **Perfection of Security Interest.**  Pledgor does hereby agree: (i) to immediately deliver to Pledgee or Pledgee's nominee all certificates evidencing any of the Pledged Collateral, (ii) to instruct each "financial intermediary" (as defined in the Uniform Commercial Code as adopted by the State of Florida) with whom Pledgor maintains an account reflecting Pledgor's ownership of any of the Pledged Collateral to note Pledgee's security interest in such Pledged Collateral on the books and records of such financial intermediary, (iii) to execute and deliver a notice of Pledgee's security interest in the Pledged Collateral (which notice shall be satisfactory in form and substance to Pledgee and may reasonably request acknowledgment from the addressee) to each third-party which has possession of the Pledged Collateral or any certificates evidencing the Pledged Collateral or otherwise has the ability under applicable law to transfer ownership of any of the Pledged Collateral (whether at the direction of Pledgor or otherwise), (iv) to execute and deliver to Pledgee such financing statements as Pledgee may reasonably request with respect to the Pledged Collateral, and (v) to take such other steps as Pledgee may from time to time reasonably request to perfect Pledgee's security interest in the Pledged Collateral under applicable law.  The Pledgor further agrees, at the request of Pledgee, to use its best efforts to cause the Company to issue, in substitution for existing certificates evidencing any of the Pledged Collateral, one or more new certificates ("Substitute Certificate(s)") intended to evidence (in as few certificates as possible) all of the Pledged Collateral evidenced by the certificates and all of the Pledged Collateral evidenced by the certificates which are exchanged for the Substitute Certificate(s), and Pledgor shall immediately thereafter deliver such Substitute Certificates to Pledgee, together with attached Powers.  Pledgor hereby appoints Pledgee, upon or at any time after the occurrence and during the continuance of an Event of Default, as its attorney-in-fact, with authority at any time or times to take any of the foregoing actions on behalf of Pledgor.  The Pledgor agrees that this Agreement or a photocopy of this Agreement shall be sufficient as a financing statement.

3.    **Voting Rights.**  During the Term (as defined herein) of this Agreement, and so long as any Obligations remain outstanding, Pledgor shall have the right to vote the Membership Interest or exercise any voting rights pertaining to the Pledged Collateral (which may, subject to any registration of Pledgee's security interest pursuant to Section 2 hereof, be registered on the books and records of Pledgor in Pledgor's name except as otherwise provided in Section 7 hereto), and to give consents, ratifications and waivers with respect thereto, on all corporate questions for all purposes not inconsistent with the terms of the Transaction Documents.  Only at such time as an Event of Default has occurred and is continuing, Pledgee shall be entitled to exercise all voting powers pertaining to the Pledged Collateral.



Pledgor

4.    **Dividends and Other Distributions.**  Until such time as the Obligations have been paid in full, all dividends and other distributions payable with respect to the Pledged Collateral shall be paid in accordance with Pledgor's bylaws or trust agreement.  If an Event of Default has occurred and is continuing, Pledgor shall promptly remit to Pledgee any such dividend or other distribution paid to Pledgor, and until so paid to Pledgee, Pledgor shall hold such dividend or other distribution in trust for Pledgee.

5.    **Representations.**  Pledgor warrants and represents to Pledgee as follows:

a.    Pledgor is a Land Trust set up pursuant to the Florida Statutes of the State of Florida, and Pledgor is active and in good standing.  This Agreement constitutes the valid and legally binding obligations of the Pledgor, enforceable in accordance with its terms and conditions.  Pledgor need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement, except as set fort herein.

b.    Pledgor shall be the sole owner of the Membership Interest.  Only the Membership Interest, as defined in this Agreement, is subject to this Agreement.  The Membership Interest has been duly authorized, validly issued, fully paid, and non-assessable, and held of record and beneficially owned by Pledgor, free and clear of any liens, claims and encumbrances;

c.    Neither the execution and the delivery of this Agreement or any of the Transaction Documents, nor the consummation of the transactions contemplated hereby or thereby will: (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Pledgor is subject, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Pledgor is a party or by which he is bound or to which any of his assets are subject (or result in the imposition of any lien or encumbrance upon any of its assets), except where the violation, conflict, breach, default, acceleration, termination, modification, cancellation, failure to give notice, or lien or encumbrance would not have a material adverse effect on the business, financial condition, operations, results of operations, or future prospects of the Pledgor or on the ability of the Parties to consummate the transactions contemplated by this Agreement.  Pledgor does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement except where the failure to give notice, to file, or to obtain any authorization, consent, or approval would not have a material adverse effect on the business, financial condition, operations, results of operations, or future prospects of the Pledgor or on the ability of the Parties to consummate the transactions contemplated by this Agreement;

d.    There are no restrictions upon the transfer of all or any part of the Pledged Collateral except as provided by the terms and provisions of the Note, this Agreement or the Transaction Documents;

e.    Pledgor has the right, subject to the terms and provisions of this Agreement, the Note and the Transaction Documents to: (i) vote the Pledged Collateral, and (ii) pledge and grant



a security interest in all or any part of the Pledged Collateral to Pledgee free of any liens, claims and encumbrances;

f.    Pledgor has the right to otherwise transfer all or any part of the Pledged Collateral free of any Lien to Pledgee; and

g.    The Assignment is duly executed and gives Pledgee the authority it purports to confer.

6.    **Subsequent Changes Affecting Pledged Collateral.**  Pledgor represents to Pledgee that Pledgor has made its own arrangements for keeping informed of changed or potential changes affecting the Pledged Collateral (including, but not limited to, rights to convert, rights to subscribe, payment of dividends, reorganization or other exchanges, tender offers and voting rights).   Notwithstanding the foregoing, Pledgee shall have the responsibility for informing Pledgor of any such changes or potential changes initiated by Pledgee and for taking any action or omitting to take any action with respect thereto.  The Pledgee may, upon or at any time after the occurrence of an Event of Default, without notice or demand, and at Pledgee's option, transfer or register the Pledged Collateral or any part thereof into its or its nominee's name with or without any indication that such Pledged Collateral is subject to the security interest hereunder.

7.    **Pledged Membership Interest Adjustments.**  In the event that, during the Term of this Agreement, any dividend, reclassification, readjustment or other change is declared or made in the capital structure of Pledgor (including, without limitation, the issuance of additional membership interest shares in Pledgor), then Pledgee shall have a security interest in any substituted membership interest or other securities and a pro rata interest in any new or additional membership interest shares or other securities issued by the Company to Pledgor and such membership interest shares or other securities shall become part of the Pledged Collateral.

8.    **Warrants, Options and Other Rights.**  In the event that, during the Term of this Agreement, subscription warrants or any other rights or options shall be issued by Pledgor in connection with the Pledged Collateral, then Pledgee shall have a security interest in such warrants, rights and options, and such warrants, rights and options shall become part of the Pledged Collateral.

9.    **Consent.**  Pledgor hereby consents that from time to time, before or after the occurrence of an Event of Default, with or without notice to or assent from Pledgor, any other security at any time held by or available to Pledgee for any of the Obligations may be exchanged, surrendered or released, and any of the Obligations may be changed, altered, renewed, extended, continued, surrendered, compromised, waived or released, in whole or in part, as Pledgee may deem appropriate, and Pledgor shall remain bound under this Agreement.

10.    **Event of Default.**  The following shall constitute an "Event of Default" for purposes of this Agreement:  (i) if Pledgor fails to pay any payment when due under or with respect to the Note (whether such amount is due by acceleration or otherwise), after applicable grace and cure periods; (ii) if Pledgor fails to perform any obligation or breaches any warranty, representation, obligation or covenant to Pledgee under any of the Transaction Documents; or (iii) if Pledgor makes an assignment for the benefit of creditors, or becomes the subject of any bankruptcy, insolvency or debtor rehabilitation proceeding.

11.    **Remedies.**  Pledgee may, upon or at any time after the occurrence and during the continuance of an Event of Default under the Note or this Agreement, at its option:



Pledgee

Pledgor

(a)    register any or all Pledged Collateral hereunder in the name of the Pledgee or its nominees, and the Pledgee or its nominees may thereafter, without notice, exercise all voting and corporate rights in respect of the Pledged Collateral and exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any of the Pledged Collateral as if the Pledgee or its nominees were the absolute owner thereof, including, without limitation, the right to exchange, at their discretion, any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization or other readjustment of the Company or upon the exercise by the Pledgor of any right, privilege or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as the Pledgee or its nominees may determine, all without liability except to account for property actually received by the Pledgee or its nominees, but the Pledgee shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing; and/or

(b)    exercise any one or more of the rights or remedies under the Note, this Agreement, the Transaction Documents, or the Uniform Commercial Code as in effect in the State of Florida or otherwise granted by law, equity or agreement; and/or

(c)    act with respect to the Pledged Collateral as though the Pledgee were the outright owner thereof (including, without limitation, the right to vote the same), the Pledgor hereby irrevocably constituting and appointing the Pledgee as the Pledgor's proxy and attorney-in-fact with full power of substitution so to do; and/or

(d)    receive all distributions of any kind made with respect to the Pledged Collateral; and/or

(e)    upon the occurrence of any Event of Default, as defined herein, by reason of which the Pledgee has declared the unpaid balance of the Obligations to be due and payable, the Pledgee may from time to time sell, assign and deliver the whole or any part of the Pledged Collateral at any broker's board or at any private sale or at public auction, with or without demand or advertisement of the time or place of sale or adjournment thereof or otherwise, for cash, for credit or for other property, for immediate or future delivery, and for such price or prices and on such terms as the Pledgee, in its sole discretion, may determine, subject to the following:

(i)    In the event the Pledgee is permitted to sell any of the Pledged Collateral pursuant to the terms of this Agreement and such Pledged Collateral is not, in the sole opinion of counsel for the Pledgee, registered under all applicable Federal Securities Laws and Blue Sky Laws so as to allow the public sale thereof, then the Pledgee, in its sole discretion, is hereby expressly authorized to sell such Pledged Collateral or such part thereof by private sale in such manner and under such circumstances as the Pledgee may deem necessary or advisable in order that such sale may legally be effected without such registration. Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion: (1) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Pledged Collateral or such part thereof shall have been filed under such Federal Securities Laws or Blue Sky Laws, (2) may approach and negotiate with a restricted number of potential purchasers to effect such sales; and (3) may restrict such sale to purchasers as to their number, nature of business and investment intention (including, without limitation, to purchasers each of who will represent and agree to the satisfaction of the Pledgee that



Pledgee                                                                                      Pledgor

such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Pledged Collateral or part thereof), it being understood that the Pledgee may require the Pledgor, and the Pledgor hereby agree upon the written request of the Pledgee to cause: (A) a legend or legends to be placed on the certificates to be delivered to such purchasers to the effect that the Pledged Collateral represented thereby has not been registered under the Federal Securities Laws or Blue Sky Laws and setting forth or referring to any required restrictions on the transferability of such securities; (B) the issuance of stop transfer instructions to the Pledgor's transfer agent, if any, with respect to the Pledged Collateral, or, if the Pledgor transfer its own securities, a notation in the appropriate records of the Pledgor; (C) to be obtained from the purchasers a signed written agreement that the Pledged Collateral will not be sold without registration or other compliance with the requirements of the Federal Securities Laws and Blue Sky Laws; and (D) to be delivered to the purchasers a signed written agreement of the Pledgor that such purchasers shall be entitled to the rights of the Pledgee pursuant to this paragraph. In the event of any such sale, the Pledgor hereby consents and agrees that the Pledgee shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price which the Pledgee, in its sole and absolute discretion, may deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were public and deferred until after registration as aforesaid;

(ii)     For the purposes hereof: (1) a private sale shall mean a sale after solicitation of a number of persons reasonably approximating the maximum number which, in the sole opinion of the Pledgee, shall not require registration of the Pledged Collateral so being offered for sale pursuant to or in compliance with Federal Securities Laws and the Blue Sky Laws; and (2) an agreement to sell all or any part of the Pledged Collateral shall be treated as a sale thereof, and the Pledgee shall be free to carry out such sale pursuant to such agreement and the Pledgor shall not be entitled to the return of any of the Pledged Collateral subject thereto notwithstanding that after the Pledgee shall have entered into such agreement all Events of Default, as defined herein, may have been remedied or the Obligations shall have been paid in full; and,

(iii)     The Pledgee shall apply the proceeds of any sale of the whole or any part of the Pledged Collateral, after first deducting all costs and expenses of collection, sale and delivery (including, without limitation, reasonable attorneys' fees and expenses through all proceedings, trials and appeals) incurred by the Pledgee in connection with such sale, to the payment of all or any amounts due and payable on the Obligations.

**12.     Term.**   This Agreement shall remain in full force and effect until all of the Obligations shall have been paid in full to Pledgee (the "Term") at which time Pledgee will execute and deliver to Pledgor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to Pledgor (without recourse and without any representation or warranty) such of the Pledged Collateral as may be in the possession of Pledgee and has not theretofore been sold or otherwise applied or released pursuant to this Agreement or the Transaction Documents.

**13.     Pledgee Exercise of Rights and Remedies upon the Occurrence and During the Continuance of an Event of Default.**   Notwithstanding anything set forth herein to the contrary, it is hereby expressly agreed that, upon the occurrence and during the continuance of an Event of Default, Pledgee may exercise any of the rights and remedies provided in this Agreement or the



Pledgee

Pledgor

Transaction Documents and any other remedy at law or in equity which may be available to Pledgee.

**14.   Negative Covenants.** The Pledgor, Company or any affiliates, employees, directors, shareholders or agents of the foregoing, covenant and agree that, so long as any of the Obligations remain outstanding it shall not, other than in the ordinary course of business, and without the prior written consent of Pledgee which shall not be unreasonably withheld or delayed (any of which constitutes an Event of Default under this Agreement) do any of the following:

(a)    Fail to preserve and maintain all licenses, permits, governmental approvals, rights, privileges and franchises necessary for the conduct of Company's business, and comply with the provisions of all documents pursuant to which the Company is organized and/or which govern the Company's continued existence and with the requirements of all laws, rules, regulations and orders of any governmental authority applicable to the Company and/or the Company's business, the failure of which would have a material adverse effect upon the Company and the Company's business;

(b)    Fail to maintain and keep in force any and all insurances and bonds of the types and in amounts customarily carried in lines of business similar to that of the Company;

(c)    Except for ordinary wear and tear in the usual course of business, fail to keep all properties of the Company including, without limitation, inventory, equipment and vehicles useful or necessary to the Company's business in good repair and condition, and from time to time make necessary repairs, renewals and replacements thereto so that such properties shall be fully and efficiently preserved and maintained;

(d)    Fail to pay and discharge when due any and all Company indebtedness, obligations, assessments and taxes, both real or personal, including without limitation federal and state income taxes and state and local property taxes and assessments;

(e)    Make any substantial change in the nature of the Company's business as conducted as of the date hereof, nor sell, lease, transfer, assign, mortgage, pledge, encumber, grant any security interest in or otherwise dispose of the Membership Interest or all or a substantial or material portion of the Company's assets, except in the ordinary course of its business, which may cause any material adverse change in the financial condition or business prospects of Company, or acquire all or substantially all of the assets of, or any equity securities in, any other entity, or merge into or consolidate with any other entity;

(f)    Cause the Company to become insolvent, or consent to or apply for the appointment of a receiver, trustee, custodian or liquidator of Company or any of its property, and shall not generally fail to pay its debts as they become due, or shall make a general assignment for the benefit of creditors, and shall not cause any petition for any order for relief filed by or against Company under the United States Bankruptcy Code;

(g)    Cause the Company to issue or payout any extraordinary compensation, salary, bonuses, or any other major distributions to the Pledgor or any other employees, directors, shareholders or agents of the Company except to the extent necessary to satisfy the Obligations;

(h)    Cause the Company to incur any additional indebtedness, additional contingent liabilities or lend money or credit to or make or permit to be outstanding loans or advances to any person, firm or corporation outside the normal course of business. For the purposes hereof, the



sale or assignment of accounts receivable and the execution of leases or rental agreements, shall constitute incurring indebtedness, and the execution of any guaranty agreement or letter of credit agreement shall constitute the incurrence of a contingent liability; however, the same may be done in the normal course of business; or,

(i)    Cause the occurrence of a cessation of a substantial part of the Company's business for a period of time which significantly affects the Company's capacity to continue Company's business, or cause the Company to be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of the Company's business affairs.

**15.    Definitions.**  The singular shall include the plural and vice versa and any gender shall include any other gender as the context may require.

**16.    Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Pledgor, Pledgee and their respective successors and assigns.  Pledgor's successors and assigns shall include, without limitation, a receiver, trustee or pledgor-in-possession of or for Pledgor, as applicable.

**17.    Applicable Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of Agreement.

**18.    Further Assurances.**    Pledgor agrees that it will cooperate with Pledgee and will execute and deliver, or cause to be executed and delivered, all such other stock powers, proxies, instruments, documents and resignations of officers and directors, and will take all such other action, including, without limitation, the filing of financing statements, as Pledgee may reasonably request from time to time in order to carry out the provisions and purposes hereof.

**19.    Pledgee Duty.**  Pledgee shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Collateral.  Pledgee shall be under no obligation to take any steps necessary to preserve rights in the Pledged Collateral against any other parties but may do so at its option, and all expenses incurred in connection therewith shall be for the sole account of Pledgor, and shall be added to the Obligations secured thereby.

**20.    Assignment.**  Unless otherwise set forth in this Agreement, Pledgor shall not assign, transfer, sell or hypothecate any or all of Pledgor's rights, title, interests and/or obligations under this Agreement without the prior written consent of Pledgee.  Pledgee may, in its sole discretion, assign any or all of its rights, entitlements or interests hereunder to any subsidiary, affiliate, or third-party designee.

**21.    Amendments and Waiver.**  No amendments or waivers of any provision of this Agreement shall be binding unless made in writing and signed by the Party against whom enforcement is sought.  Any waiver by any Party of a breach of any provisions of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof, or of any other provision of this Agreement.


Pledgee

Pledge and Security Agreement
FHP-MS, LLC
Page 8 of 12

Pledgor

22.     **Notices.**   Any notice, communication, request, reply or advice or other notice pertaining to this Agreement to be given, made or accepted by either party to the other must be in writing and shall be given or be served upon the parties at their addresses set forth herein only by dispatching the same:   (i) by hand delivery, (ii) by any reputable overnight courier delivery service, and such notice so dispatched shall become effective on the date of receipt, or (iii) by United States Certified mail and addressed to the party to be notified, with return receipt requested, and such notice so dispatched shall be effective three (3) days after the date it is so dispatched to each Party's address as set forth above, or to such other address as designated by either Party in writing to the other Party.

23.     **Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  For purposes of executing this Agreement, a document signed and transmitted by facsimile machine, electronic mail or telecopier shall be treated as an original document.  The signature of any Party thereon shall be considered as an original signature and the document transmitted shall be considered to have the same binding legal effect as if it were the signed original.  At the request of either Party, any facsimile or telecopy document shall be re-executed by both Parties in original form.  No Party hereto may raise the use of facsimile machine or telecopier or the fact that any signature was transmitted through the use of a facsimile or telecopier machine as a defense to the enforcement of this Agreement.

24.     **Section Headings.**   The section headings herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

25.     **Attorneys' Fees and Costs.**   In the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this Agreement, the Parties hereto agree that the prevailing party or parties shall be entitled to recover from the other party or parties, upon final judgment on the merits, reasonable attorneys' fees and costs, including attorneys' fees and costs for any appeal, incurred in bringing such suit or proceeding.

26.     **Jurisdiction and Venue.**   The Parties acknowledge and agree that without limiting the jurisdiction or venue of any other Federal or state courts each Party irrevocably and unconditionally: (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement, or the transactions contemplated hereby, must be brought in Orange County, Florida; (b) consents to the jurisdiction of such court in any suit, action or proceeding; (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such manner as may be provided under applicable laws or court rules in the State of Florida.

27.     **Advice of Counsel.**   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.

28.     **Entire Agreement.**   This Agreement and the instruments to be delivered by the Parties hereto represent the entire understanding and agreement between the Parties hereto and



supersedes all prior verbal and written and all contemporaneous verbal negotiations, commitments and understandings between such Parties with respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the Parties' duly authorized representatives have executed this Agreement as of the date first above written.

**WITNESSES:**

Name:    Leonard H. Baird, Jr.

Name:    Rachel P. Eller

**PLEDGOR:**

**Ravi Roopnarine, as Trustee of the RAVI WORLD LAND TRUST DATED DECEMBER 20, 2007**

Signature:
By:    Ravi Roopnarine
Title:    Trustee

**WITNESSES:**

Name:    Leonard H. Baird, Jr.

Name:    Rachel P. Eller

**PLEDGEE:**

**MIRABILIS VENTURES, INC.,**
a Nevada corporation

Signature:
By:    Jodi Jaiman
Title:    President



STATE OF    Florida    )
COUNTY OF   Lake     )

I certify that on December   27th 2007, Ravi Roopnarine who is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, came before me in person and stated to my satisfaction that he:

      (a)      has been duly sworn to me and made the attached instrument; and

      (b)      was authorized to and did sign and execute this instrument on behalf of and as Trustee of the RAVI WORLD LAND TRUST Dated December 20, 2007 (the "Trust"), the entity named in this instrument, as the free act and deed of the Trust, by virtue of the authority granted by the RAVI WORLD LAND TRUST Agreement. He is personally known to me xxxhxxxxx xproduxxxk xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxasxidxasxificxxiaxx

[SEAL]

         Rachel P. Eller
         Commission # DD462422
         Expires December 16, 2009
         Bonded Thru Troy Fain - Insurance Inc. 800-385-7019

Notary Public

Name:

STATE OF    Florida    )
COUNTY OF   Lake     )

On this the    27th day of December, 2007, before me personally came Jodi Jaiman, President of Mirabilis Ventures, Inc, who being by me duly sworn, did depose and say that she signed, sealed and delivered this instrument as her voluntary act and deed. She is personally known to me or has produced    driver's license    as identification.

[SEAL]

         Rachel P. Eller
         Commission # DD462422
         Expires December 16, 2009

Notary Public

Name:

## EXHIBIT A

## <u>IRREVOCABLE MEMBERSHIP INTEREST POWER AND ASSIGNMENT</u>

For Value Received, the undersigned assigns and transfers unto **Mirabilis Ventures, Inc.**, a Nevada corporation, Seventy Percent (70%) of the total issued and outstanding membership interests ("Membership Interest") of **FLHP-MS, LLC**, a Florida limited liability company (the "Company"), standing in the name of the undersigned on the books of said Company represented by Certificate No. _____, and herewith and hereby irrevocably constitutes and appoints _____ or its designee, as attorney-in-fact to transfer the said stock on the books of the within named Company with full powers of substitution in the premises in the Event of Default as defined in the Pledge and Security Agreement to which this Exhibit A is attached.

Dated: __December 27, 2007__

**WITNESSES:**

Name: Leonard H. Baird, Jr.

Name: Rachel P. Eller

**Ravi Roopnarine, as Trustee of the
RAVI WORLD LAND TRUST
DATED DECEMBER 20, 2007**

Signature:
By:    Ravi Roopnarine
Title:    Trustee

STATE OF __Florida__ )
COUNTY OF __Lake__ )

I certify that on December 27th, 2007, Ravi Roopnarine who is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, came before me in person and stated to my satisfaction that he:

(c)    has been duly sworn to me and made the attached instrument; and

(d)    was authorized to and did sign and execute this instrument on behalf of and as Trustee of the RAVI WORLD LAND TRUST Dated December 20, 2007 (the "Trust"), the entity named in this instrument, as the free act and deed of the Trust, by virtue of the authority granted by the RAVI WORLD LAND TRUST Agreement. He is personally known to me xxxxxxxx xxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxx

[SEAL]

Notary Public

Name:



Pledgee

Pledgor